CRAMP SHIPBUILDING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 12673, 16347. Promulgated January 13, 1950.

*Thomas Reath, Esq., Frederick E. S. Morrison, Esq.,* and *Calvin H. Rankin, Esq.,* for the petitioner.

*Brooks Fullerton, Esq.,* for the respondent.

#### OPINION.

MURDOCK, *Judge*: The Commissioner determined deficiencies in the income and excess profits tax of the petitioner as follows:

| Docket No. | Year | Deficiency | |
|---|---|---|---|
| | | Income tax | Excess profits tax |
| 12673 | 1942 | | $545,289.91 |
| | 1943 | $98,850.28 | 1,775,893.55 |
| | 1944 | 255,674.20 | 1,133,795.29 |
| 16347 | 1945 | 124,697.27 | 478,979.51 |

[4] The "cost" of the options was computed by adding to the purchase price, $135, the cost of transfer stamps, $673.28.

The only issue for decision at this time, there having been a severance of other issues, is whether the petitioner, Cramp Shipbuilding Co., hereinafter referred to as Cramp, is entitled to deductions for the years 1943, 1944, and 1945 for amortization of its emergency plant facilities on the basis of an accelerated period of 33 months, instead of on the basis of 60 months as allowed by the Commissioner in determining the deficiency. The truth of all facts material to this issue has been agreed to by the parties and the issue is decided upon the facts thus placed in the record.

Cramp's income and excess profits tax returns for the taxable years were timely filed with the collector of internal revenue for the first district of Pennsylvania. Its books have been kept and its returns filed upon an accrual method of accounting.

Cramp was incorporated at the request of the United States Navy Department as a part of the expansion of the defense program authorized by Congress in the summer of 1940. It was to acquire an old shipyard in Philadelphia, rehabilitate and enlarge it, and use it for the construction of vessels for the Navy Department. It acquired this shipyard on October 15, 1940, and executed two contracts with the Navy Department on October 29, 1940. One contract, NOd–1550, was for the acquisition and construction of the emergency plant facilities mentioned above, and the other was for the construction of 6 light cruisers. The total cost of the emergency plant facilities was to be not more than $10,000,000, but subsequently was increased so that it was to be not more than $12,000,000. The facilities were to be completed within 18 months and title was to be in Cramp. The Navy Department agreed that after the completion of the facilities it would reimburse Cramp for the total cost thereof in 60 equal monthly installments, beginning with the month following the month of completion. The contract further provided that Navy had a right to terminate the contract at any time upon payment of the balance due, in which case Cramp was to convey the shipyard to the Navy or retain it upon payment of cost, less amounts previously paid to Navy, and less depreciation at 10 per cent per annum.

A certificate of necessity, in accordance with section 124 of the Internal Revenue Code, was issued to Cramp on January 3, 1941, covering the facilities to be acquired or constructed by Cramp pursuant to contract NOd–1550.

Cramp borrowed money from banks and completed the construction of the facilities in December, 1942, at a total allowable cost of $11,953,714.79, which amount was the adjusted basis of the facilities in the hands of Cramp as of December 31, 1942, for computing amortization under section 124.

Contract NOd–1550 was terminated by the Navy Department on

September 20, 1946, at which time Cramp elected not to retain the facilities, but to transfer them to the United States Government.

The following table shows the amount paid in each year by the Government for the benefit of Cramp as reimbursement of the cost of facilities under contract NOd–1550:

| | |
|---|---|
| 1943 | $2,390,742.96 |
| 1944 | 2,390,742.96 |
| 1945 | 2,390,742.96 |
| 1946 | 4,781,485.91 |
| Total | 11,953,714.79 |

The Commissioner had issued a ruling in T. D. 5016, dated October 23, 1940, and approved by the Secretary of the Treasury, stating in part that:

> * * * Amounts received by a taxpayer in connection with its agreement to supply articles for national defense, though denominated reimbursements for all or a part of the cost of an emergency facility, are not to be treated as capital receipts but are to be taken into account in computing income, and are therefore not to be applied in reduction of the basis of such facility.

The petitioner wanted to know how the reimbursements which it was to receive from the Navy would be treated for tax purposes, whether and to what extent it would be entitled to deductions for amortization on the facilities, and whether it would be subject to any gain and what basis it would have in case it kept the facilities. The respondent concedes in his brief that there was reason for doubt at the time as to how those questions should be answered. The petitioner submitted those questions to the Commissioner in December, 1940, and asked for a closing agreement. Several letters passed between the parties and, finally, a closing agreement was entered into. The closing agreement, executed on Form 906 pursuant to section 3760 of the code, was entered into in the latter part of 1941 and was duly approved by the Acting Secretary of the Treasury on December 30, 1941. It has never been canceled, amended, or superseded. It contained the following provisions, among others:

> The monthly installments to be paid by the United States to Cramp Shipbuilding Company as reimbursements for plant costs under an Emergency Plant Facilities Contract entered into on October 29, 1940, constitute taxable income to Cramp Shipbuilding Company accruable in the respective months in which such payments are due. (Sec. 21, 22, 41 and 42, I. R. C.)

> The facilities or parts thereof, to be constructed, acquired and installed by Cramp Shipbuilding Company pursuant to said Emergency Plant Facilities Contract designated NOd–1550 and covered by necessity certificate No. ND–N–12, will be considered to be one emergency facility which will be subject to an allowance for amortization deductions as provided by section 124 of the Internal Revenue Code, as amended, provided all of the requirements of that section are satisfied.

\*    \*    \*    \*    \*    \*    \*

Section 124 provided that every person at his election would be entitled to a deduction with respect to the amortization of the adjusted basis of any emergency facility based on a period of 60 months in lieu of the deduction with respect to such facility provided by section 23 (1), relating to depreciation. It further provided that, if the President proclaimed the ending of the emergency period within the 60 months, then the taxpayer could elect to terminate the amortization period with respect to the emergency facility as of the end of the month in which the proclamation was issued, and in that case the amortization period with respect to the facility would end with the end of that month instead of at the end of the 60-month period.

The President proclaimed the ending of the emergency period on September 29, 1945, and Cramp on December 26, 1945, filed an election under section 124 (d) to terminate the amortization period of its emergency facilities as of the end of September, 1945. The stipulation shows that it had a right at that time to make the election. Cramp also filed within the time prescribed by section 124 (j) an application for tentative adjustment with respect to its taxes paid for the years 1942, 1943, and 1944, claiming for each of the years 1943 and 1944 an amortization deduction of $4,346,805.36 on the basis of a period of 33 months beginning January 1, 1943, and ending September 30, 1945. It claimed on its 1945 return $3,260,104.07 as a deduction for amortization of its emergency facilities constructed under contract NOd-1550.

The Commissioner, in determining the deficiencies, included in income and allowed as a deduction for amortization of the emergency facilities under contract NOd-1550 the exact amount which the Government paid for the benefit of Cramp in each year under that contract. The following table shows the amortization deductions on facilities under contract NOd-1550 as claimed by the petitioner and as allowed by the Commissioner in determining the deficiency:

| Year | Claimed | Allowed |
|------|---------|---------|
| 1943 | $4,346,805.36 | $2,390,742.96 |
| 1944 | 4,346,805.36 | 2,390,742.96 |
| 1945 | 3,260,104.07 | 2,390,742.96 |
| 1946* | None | 4,781,485.91 |
| Total | 11,953,714.79 | 11,953,714.79 |

*Tax liability for 1946 is not at issue in these proceedings.

The Commissioner does not contend that the petitioner has failed to comply with any of the formal steps required by section 124 in order to obtain the amortization deductions over the shorter period.

Section 3760 of the code authorized the Commissioner to enter into an agreement in writing with any person relating to the liability of such person in respect of any internal revenue tax for any taxable period, and further provided that, after such an agreement has been

entered into and approved by the Secretary, "such agreement shall be final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact   *   *   *   in any suit, action, or proceeding, such agreement   *   *   *   shall not be annulled, modified, set aside, or disregarded." No claim is made in this proceeding that there was any fraud, malfeasance, misrepresentation of a material fact, or any failure to comply with section 3760 upon which the Commissioner might rely to set aside the closing agreement. Closing agreements are binding upon the parties and final unless set aside for one of the reasons mentioned. *Aetna Life Insurance Co.* v. *Eaton*, 43 Fed. (2d) 711; certiorari denied, 282 U. S. 887; *Wolverine Petroleum Corporation* v. *Commissioner*, 75 Fed. (2d) 593; certiorari denied, 295 U. S. 743; *Hering* v. *Tait*, 65 Fed. (2d) 703; *B. D. Phillips*, 8 T. C. 1286, 1294; *Bankers' Reserve Life Co.* v. *United States*, 42 Fed. (2d) 313; certiorari denied, 282 U. S. 871.

The petitioner has complied in every respect with the provisions of section 124. The closing agreement provided that it could take deductions under that section, and it may have had that right in any event, provided the reimbursements were to be treated as income. The stipulated facts show that the amounts now claimed by the petitioner are the correct amounts. The conclusion is inescapable that the petitioner is entitled to those deductions, and the Commissioner erred in failing to allow them.

The Commissioner argues at length in his brief that the reimbursements were not income to the petitioner and "the petitioner had no amortizable investment or interest in the facilities." This argument is not based upon any fact which he did not know or anticipate at the time that he entered into the closing agreement. If his present argument is sound, perhaps he should not have entered into the agreement, but, having entered into it, he is bound by it and it is directly contrary to this contention. He also argues that the closing agreement was not intended to allow amortization deductions, since it merely stated that such deductions would be allowed under section 124, "provided all of the requirements of that section are satisfied," and the petitioner's factual situation is not within those requirements. Each of these arguments is inconsistent with the determination of the Commissioner upon which the present proceeding is based allowing amortization deductions. Each is also inconsistent with the stipulation of facts submitted in the case by the parties, in which they stipulated the cost of the facilities to the petitioner and the adjusted basis of the facilities for computing the amortization deductions under section 124.

The Commissioner argues that the amortization deduction for each year must be equivalent to the amount of reimbursements included in income in that year. The petitioner asked to have such a provision incorporated in the closing agreement, but the Commissioner did not

accede to that request.   Furthermore, he substituted instead a different provision of his own choice, under which his present argument is untenable.   The Commissioner argues further in this same connection that income will be distorted if the deductions in any year exceed the reimbursements included in income.   However, even if this were so, it would not be a sufficient reason in law for avoiding the clear terms of a closing agreement and the deductions allowed by section 124.

> *The parties are directed to file recomputations under Rule 50, in accordance with this opinion, or otherwise move with respect to further proceedings in the case on or before February 15, 1950.*